John Bovich (SBN 150688)
Email: jbovich@reedsmith.com
Ashley L. Shively (SBN 264912)
Email: ashively@reedsmith.com
REED SMITH LLP
101 Second Street, Suite 1800
San Francisco, CA  94105-3659
Telephone: +1 415 543 8700
Facsimile: +1 415 391 8269

Randall D. Haimovici (SBN 213635)
Email: rhaimovici@uber.com
Angela B. Johnson (SBN 287421)
Email: angelaj@uber.com
Ariel F. Ruiz (SBN 305488)
Email: ariel.ruiz@uber.com
Uber Technologies, Inc.
1455 Market Street, Floor 4
San Francisco, CA 94103-1355
Telephone: +1 415 533-7652

Attorneys for Plaintiff
Uber Technologies, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO DIVISION

| | |
|---|---|
| UBER TECHNOLOGIES, INC.,<br><br>              Plaintiff,<br><br>vs.<br><br>FETCH MEDIA, LTD.,<br><br>              Defendants. | Case No.:<br><br>**REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED**<br><br>**UBER TECHNOLOGIES, INC. COMPLAINT FOR:**<br><br>1. **BREACH OF CONTRACT**<br>2. **BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**<br>3. **INTENTIONAL BREACH OF FIDUCIARY DUTY**<br>4. **CONSTRUCTIVE FRAUD**<br>5. **FRAUD**<br>6. **NEGLIGENT MISREPRESENTATION**<br>7. **PROFESSIONAL NEGLIGENCE**<br>8. **NEGLIGENCE**<br>9. **UNFAIR COMPETITION, CAL. BUS. & PROF. CODE §§ 17200, *ET SEQ.***<br>10.  **UNJUST ENRICHMENT**<br><br>**JURY TRIAL DEMANDED** |

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

Plaintiff Uber Technologies, Inc. ("Uber"), by and through its attorneys, and for its Complaint against Defendant Fetch Media, LTD. ("Fetch" or "Defendant"), hereby alleges as follows:

## NATURE OF THE ACTION

1.      Uber brings this action to redress the injuries Fetch caused in failing to fulfill its duties and obligations as Uber's mobile advertising agency. Uber put its trust and confidence in Fetch to purchase and place digital advertisements on Uber's behalf. Uber paid a premium price and agreed to a high-volume mobile advertising campaign where spending reached millions of dollars per week because Fetch represented it had the expertise to meet Uber's growth objectives.

2.      Instead, Fetch squandered tens of millions of dollars to purchase nonexistent, nonviewable and/or fraudulent advertising. Fetch knew about the problems in the mobile inventory it purchased on Uber's behalf, and concealed those facts from Uber.

3.      Fetch nurtured this environment of obfuscation and fraud for its own personal benefit, and the personal gain of its parent company Dentsu Inc. ("Dentsu"). Fetch misrepresented its media purchasing decisions as directly attributable to Uber's growth goals to incentivize Uber to increase its mobile advertising budget to millions of dollars per week. As a result, Fetch received substantial, unearned compensation from Uber and allowed networks and publishers to take credit for Uber App installs that would have happened regardless of advertising.

4.      Fetch's actions, and those of Fetch's partners, negatively affected the user experience of millions of smartphone users by subjecting them to unwanted popup advertisements and auto-redirects.

## THE PARTIES

5.      Uber is a Delaware company with its principal place of business in San Francisco, California.

6.      Defendant Fetch is a U.K. mobile advertising agency with offices in London, Manchester, Hong Kong, Berlin, New York, and San Francisco.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

**JURISDICTION AND VENUE**

7.      This Court has diversity jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332, because there is complete diversity between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

8.      This Court has personal jurisdiction over Fetch because it is bound by a valid forum selection clause. Uber and Fetch are parties to a Services Agreement, pursuant to which the parties agreed that the laws of the State of California would govern the Agreement and Amendments thereto, and "consent[ed] to the exclusive jurisdiction and venue in San Francisco, California." Ex. B at ¶ 11.16.

9.      In addition, the Court has personal jurisdiction over Fetch because Uber's claims arise out of Fetch's forum-related activities, and, on information and belief, Fetch has purposely availed itself of the benefits and protections of the State of California by doing and transacting business in this forum.

10.     Venue is proper in this District because Fetch has consented to venue in this District and, pursuant to 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to the claims occurred in the City and County of San Francisco. For purposes of intra-district assignment under Civil Local Rules 3-2(c) and 3-5(b), assignment of this action in the San Francisco Division is proper.

**FACTUAL ALLEGATIONS**

11.     Uber is a San Francisco-based technology company. It has developed a smartphone application (the "Uber App") that enables users of the application ("riders") to request ridesharing services from independent, third-party transportation providers ("drivers").

12.     Uber gains new riders and drivers in a number of ways, including through "organic" downloads and installations of the Uber App—where a mobile phone user navigates directly to her mobile software provider's app store or marketplace and downloads the Uber App because of the user's prior knowledge of Uber's overall brand and reputation in the marketplace.

13.     Uber also relies on mobile advertising to gain new riders and drivers. "Mobile advertising" refers to advertisements that appear on either mobile-optimized websites or in mobile

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

smartphone applications such as games. When a potential rider or driver clicks on a mobile

advertisement, she is directed to the app store or marketplace where she has the opportunity to

download and install the Uber App.

  

**Figure 1 – Examples of Mobile Advertisements**

14.    "Placements" are the actual spaces on a mobile-optimized website or mobile

smartphone application (called "mobile inventory") where mobile advertising can appear.

15.    "Publishers" are companies that sell mobile inventory. A publisher can be the actual

owner of particular mobile websites or mobile smartphone applications that sell placements, such as

the New York Times mobile website or app, or a publisher can have mobile inventory from dozens

or even hundreds of different websites and/or mobile smartphone applications.

16.    "Networks" are companies that, often acting at the direction of an advertising agency,

buy mobile inventory from different sources, including directly from publishers, from other

networks that own and operate inventory from multiple publishers, from exchanges that offer mobile

inventory for sale or auction, or through a combination of these methods.

17.    "Mobile advertising agencies" are companies that specialize in digital advertisements

that appear on mobile smartphones. Mobile advertising agencies assist their clients (i.e., the

advertiser) to develop a mobile advertising strategy, buy mobile inventory on behalf of their clients,

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

increase engagement with their clients' brands, acquire new users for their clients, and related services.

18.     "Insertion Orders" or "IOs" are forms used by mobile advertising agencies to purchase, on behalf of a client, mobile inventory from networks and/or publishers. IOs typically include limitations on the types of mobile inventory on which a client's advertisements may appear (e.g., many clients elect not to advertise on sites with adult content), placement and size requirements for advertisements, payment arrangements, and other requirements. IOs are intended to ensure appropriate and legitimate mobile inventory is purchased. Mobile advertising agencies are responsible for ensuring that the terms of IOs are followed by the networks and publishers engaged on behalf of a client.

19.     Defendant Fetch is a mobile advertising agency that offers the following services to its clients:



**Figure 2 – Fetch's Public Representations of Expertise**[1]

---

[1] https://wearefetch.com/services/media/ *last viewed* September 9, 2017.

20.     Uber engaged Fetch to act as its mobile advertising agency between late 2014 and early 2017 (the "Fetch Campaign") based on Fetch's representations of its expertise as a mobile advertising agency and provider of mobile advertising services.

21.     Fetch assumed all the duties and responsibilities expected of a prudent mobile advertising agency.

22.     Uber relied on Fetch's expertise to recommend and engage networks and publishers best suited to encourage new riders to download and use the Uber App. Through Fetch, Uber purchased mobile inventory from networks, and, ultimately, publishers. The relationship between Uber and Fetch, and as between Fetch and the various networks and publishers they supervised is illustrated by the diagram below:



**Figure 3 - Fetch's Role in Supervising Networks and Publishers on Uber's Behalf**

23.     The diagram above shows that Fetch, in its capacity as Uber's mobile advertising agency, engaged networks to purchase mobile inventory to place Uber advertisements. Networks, in turn, acquired mobile inventory from publishers. Fetch's role was to select networks and supervise

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

their conduct in order to purchase legitimate mobile inventory and ultimately acquire new riders for Uber.

**A.    Uber Contracts With Fetch For Mobile Advertising Services**

24.    In connection with the Fetch Campaign, Uber and Fetch entered into a Services Agreement dated January 29, 2015 and an amendment dated December 22, 2015 (collectively "the Agreement"), true and correct copies of which are attached hereto as **Exhibits A** and **B**.

25.    Under the Agreement, Fetch promised to perform and deliver services ███████ ████████████████████████████████████████████ and to provide ████████████████████████████████████████████████████████

26.    As contemplated in the Agreement, Uber (and its affiliates) and Fetch also entered into a number of Statements of Work. As relevant here:

a.    Effective January 29, 2015, Uber and Fetch entered into a Statement of Work for expenditures in 2015 (the "2015 SOW"). A true and correct copy of the 2015 SOW is attached as **Exhibit C**.

b.    Effective December 26, 2015, Uber and Fetch entered into a Statement of Work for expenditures in 2016 (the "2016 SOW"). A true and correct copy of the 2016 SOW is attached as **Exhibit D**.

c.    On April 18, 2016, Uber and Fetch entered into an Addendum to the 2016 SOW. A true and correct copy of the Addendum to the 2016 SOW is attached as **Exhibit E**.

d.    Effective January 1, 2017, Uber and Fetch entered into a Statement of Work for expenditures in 2017 (the "2017 SOW"). A true and correct copy of the 2017 SOW is attached as **Exhibit F**.

27.    

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

28.     Uber entered into each of the above-referenced SOWs based on Fetch's continued representations that it had the resources available to acquire human viewable, quality mobile inventory at scale, and provide the relevant insight, support, and services required to meet Uber's goal of acquiring new riders in both existing and new markets.

**B.     Fetch Buys Media On Uber's Behalf And Manages Uber's Mobile Advertising Strategy**

29.     During the Fetch Campaign, Fetch purchased mobile inventory on behalf of Uber and its affiliates in a number of jurisdictions.

30.     For mobile advertising conducted in the United States, Mexico, France, the Philippines, Romania, and Singapore, Fetch purchased mobile inventory from Networks on an "agent-principal" basis—Fetch purchased mobile inventory on Uber's behalf as Uber's representative in each transaction with networks and publishers.

31.     For mobile advertising conducted in jurisdictions other than those referenced in the prior paragraph, Fetch purchased mobile inventory on a "principal transaction" basis—Fetch purchased mobile inventory from networks and publishers on its own behalf and then resold that mobile inventory to Uber.

32.     Regardless of whether Fetch purchased mobile inventory on an agent-principal or principal transaction basis, Fetch was responsible for the day-to-day oversight of networks and the vetting of publishers for quality and fraud prevention, concordant with the █████████ agreed-to in the Agreement and the duties of a reasonably prudent mobile advertising agency.

33.     Regardless of whether Fetch made mobile inventory purchases on an agent-principal or principal transaction basis, █████████████████████████████████████████

34.     Fetch's compensation under the Agreement was tied to ████████████████████████████████████████████████████████████████████

35. Specifically, Fetch was paid ███████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████████

36. Between 2016 and the first quarter of 2017, Uber paid Fetch more than $82.5 million related to the services ostensibly performed during the Fetch Campaign. ███████████
███████████████████████████████████████████████████████.

37. Beginning in December 2015, Fetch also agreed ██████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████

38. In April 2016, Fetch and Uber executed an addendum to the 2016 SOW and ███
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████

**C.     Tracking And Performance Of The Fetch Campaign**

39. Uber pays only for legitimate clicks on mobile advertisements that are attributable to installation of the Uber App, new sign ups, and/or first trips (called the "last click attribution" or "app attribution"). Uber does not pay for advertisements to simply appear on a page or for views that do not lead to one of those outcomes. Thus, when Fetch "purchases" mobile inventory on Uber's behalf, it is purchasing the final outcome—not the number of times an ad is displayed, viewed, or clicked.

40. For example, on Monday, potential rider Jane Doe views an Uber ad while browsing a shopping website on her smartphone, but does not click on the advertisement. On Tuesday, Jane

Doe views a second Uber ad displayed in a game app, clicks on the ad and is taken to the app store, but opts not to install the Uber App. On Wednesday, Jane Doe views a third Uber ad, this time displayed on a mobile news website. Jane clicks on the ad and is taken to the app store where she downloads and installs the Uber App. In this hypothetical, Fetch would only be entitled to compensation on, and to pay the publisher or network that placed the third advertisement on the mobile news website, as that click was attributable to Jane Doe's installation of the Uber App. It is thus crucial to know which click, if any, is actually attributable to each of the millions of installations of the Uber App.

41.     As part of managing the Fetch Campaign, Fetch was supposed to spend Uber's advertising budget to purchase legitimate mobile inventory. In other words, Fetch was supposed to pay networks and publishers for advertisements that caused a rider to install the Uber App on their smartphone, sign up as an Uber rider, and/or take a first trip.[2]

42.     To track which advertising network, website, or app generated clicks (and ultimately installs, sign-ups and first trips), Fetch and Uber utilized a third party mobile analytics and performance marketing platform called TUNE, Inc. ("TUNE").

43.     TUNE's mobile app tracking service is supposed to collect information about mobile advertising impressions (i.e., views) of, and clicks on, mobile advertisements. TUNE tracks clicks on ads and then matches the last reported click to a rider's installation of the Uber App. TUNE then awards credit to the publisher, network, or mobile advertising agency that placed the advertisement responsible for the last click attribution.

44.     So that Fetch could optimize Uber's mobile advertising, Fetch required networks and publishers participating in the Fetch Campaign to identify all app and mobile websites running Uber advertisements. Networks and publishers were also required to implement "click tracking," which was intended to identify the publisher reporting clicks that resulted in installations, the particular advertisement at issue, and the app or website name where the click generated from. Fetch was responsible for ensuring that the networks and publishers that it engaged reported accurate and legitimate information to TUNE.

---

[2] For the sake of brevity, Uber generally refers herein only to "installations" or "installs."

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

45. The diagram below illustrates TUNE's mobile app tracking methodology employed to determine the last click attribution, and therefore, which network or publisher "partner" should be paid by Fetch using Uber's advertising budget:



**Figure 4 - Attribution for Mobile Advertising**

46. In addition to ensuring that networks and publishers report accurate information to TUNE, Fetch also prepared reports aggregating the information reported through TUNE for Uber to assess the quality of the Fetch Campaign ("transparency reports"). Transparency reports were intended to be final and true reflections of (i) where Fetch's media partners were running Uber advertisements, and (ii) the clicks and installations attributable to those ads. Given the volume of Uber's mobile advertising, the transparency reports were also the only accessible means for Uber to "see" the apps and mobile websites where its advertisements appeared and to assess the impact of particular networks and publishers.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

47.     Beginning in mid-2015, Fetch provided transparency reports to Uber and represented that such reports accurately reflected the Uber App installs driven by the networks and publishers selected by Fetch to participate in the Fetch Campaign.

48.     Uber relied on Fetch's representations about the transparency reports in assessing the Fetch Campaign against the key performance indicators used to judge Fetch's success as Uber's mobile advertising agency.

49.     Based on Fetch's representations, Uber's monthly mobile advertising spending on the Fetch Campaign grew from less than $1 million per month in late 2015 to in excess of $6 million per month by late 2016. Uber believed the money it paid was for legitimate app attribution, not for fraudulently claimed attribution.

**D.     Fraud In Mobile Advertising**

50.     Paying networks and publishers based on last click attribution is a standard method of compensation in the mobile advertising industry. In the absence of monitoring by the mobile advertising agency overseeing the campaign, however, the model can invite fraud.

51.     Mobile advertising fraud generally falls within two broad categories: (i) fraudulent installations, and (ii) attribution fraud.

52.     "Attribution fraud" refers to a scheme where networks or publishers seek credit for organic installations and for installations actually attributable to other media sources. Attribution fraud occurs when networks or publishers insert false information into TUNE's attribution algorithm, as demonstrated by the diagram below:

///

///

REED SMITH LLP
A limited liability partnership formed in the State of Delaware



**Figure 5 - Attribution Fraud in Mobile Advertising**

53.    Some of the key forms of attribution fraud include the following:

a.    "Click Spamming" is where a network or publisher fraudulently generates or reports clicks for users without those clicks actually having occurred. Click spammers report thousands or even millions of fake clicks so that when a user organically installs the Uber App, it will appear as if the installation was attributable to a fraudulently reported click, thus qualifying for payment. On information and belief, the custom and practice in the mobile advertising industry holds that a high reported click rate without corresponding installs is indicative of fraud.

b.    "Fake or Malicious Sites" refers to a scheme where a network or publisher reports (and seeks payment for) significant numbers of Uber App installs as attributable to clicks

made on fake or malicious website URLs, i.e., a website which is not a real site or is a sham. In this scheme, networks and publishers try to trick the TUNE tracking system to steal organic installations of the Uber App. On information and belief, the custom and practice in the mobile advertising industry holds that clicks or installs claimed as attributable to fake or malicious sites are fraudulent.

c.      "Stacked Ads" or "Ad-stacking" refers to the schemes where a single mobile inventory placement is filled with several mobile advertisements, even though only one advertisement is visible. When the viewer clicks on a stacked ad, several clicks are sent to TUNE, of which only one reflects legitimate user interest in a mobile advertisement.



**Figure 6 - Example of Ad Stacking**

On information and belief, the custom and practice in the mobile advertising industry holds that stacked ads are fraudulent because the viewer never intended to click on, and never actually saw, multiple advertisements.

d.      "Auto-Redirects" refers to the scheme where a mobile user is automatically redirected to the app store or marketplace without having clicked on any mobile advertisement whatsoever. Auto-redirects are generally coded into the mobile smartphone application or mobile

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

website and used to generate millions of fake clicks to prompt installations or (more often) take

credit for organic installations. On information and belief, the custom and practice in the mobile

advertising industry holds that auto-redirects are fraudulent because the viewer never intended to

click on an advertisement but was still redirected.

e.      "Creative Issues" refer to instances where advertising content is displayed on

a website or mobile smartphone application in a manner that deceives the user; for instance, where

an ad is so small it is mistaken for a smartphone keyboard button and generates unintentional clicks

by the viewer.



**Figure 7 - Example of Creative Issues: Ad Placement (Multi-Colored Block) Next to**

**'Backspace' Key**

On information and belief, the custom and practice in the mobile advertising industry holds that

creative issues in violation of IOs are indicative of fraud.

54.      Fraud is also perpetuated through, and/or apparent from, the metrics and data that

networks and publishers report through TUNE, and that Fetch put into the transparency reports it

provided to Uber.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1     a.      "Metric Smoothing" refers to the scenario when a network or publisher

2  misreports where advertisements are placed in order to conceal the true placement of the

3  advertisement (or perhaps no placement at all). Misreporting can be spotted in transparency reports,

4  for example, when a publisher reports key metrics, such as click volume and installs, across multiple

5  mobile websites or apps all within a very close percentage of each other. For example, the ten lines

6  excerpted immediately below are from a February 2017 Fetch transparency report where more than

7  100 sites reported nearly identical clicks, installs, and click-to-install rates:



**Figure 8 - Example of Metric Smoothing from Fetch Transparency Reports**

17  Patterns like this suggest that networks or publishers concealed the true placement of advertisements

18  and allocated supposed clicks and installs across a number of platforms to give the appearance of

19  legitimacy. On information and belief, the custom and practice in the mobile advertising industry

20  holds that where a number of apps report nearly identical metrics is indicative of fraud.

21     b.      "Falsified Transparency" includes the scenario where a network or publisher

22  reports vague website or app names through TUNE, such as "MP3 Player" (e.g., as opposed to a

23  specific streaming service), as a source of clicks and installs. Falsified transparency also includes the

24  scenario where a website or app reports clicks and installs on Uber advertisements severely

25  disproportionate to the number of active users. For example, in the Fetch transparency report

26  excerpted below, the number of *weekly* reported clicks on Uber advertisements ███ that

27  supposedly appeared on the website ██████████ is nearly equal to the number of *monthly*

28  active users ██████ of that site:

REED SMITH LLP
A limited liability partnership formed in the State of Delaware



**Figure 9 - Example of Falsified Transparency from Fetch Transparency Reports**

On information and belief, the custom and practice in the mobile advertising industry holds that such reporting issues are indicative of fraud.

        c.      "Deceptive Naming" includes the scenario where a network or publisher misrepresents the source of its mobile inventory. Deceptive naming can be identified, for example, when the audience and/or demographic of a website or app supposedly running an advertisement does not make sense with respect to the reported installations. For example, in February 2017 transparency reports provided by Fetch, a significant number of Uber App installs were reported as attributable to an Uber advertisement that supposedly appeared in ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮.



**Figure 10 - Example of Deceptive Naming from Fetch Transparency Reports**

On information and belief, the custom and practice in the mobile advertising industry considers all forms of deceptive naming as a form of fraud.

        d.      "Non-Mobile Optimized Sites" refers to the scenario where a network or publisher reports significant numbers of installations as attributable to clicks made on advertisements that supposedly appeared on non-mobile optimized websites. Non-mobile optimized sites can be challenging to navigate on smartphones, and advertisements are difficult to view, making it extremely unlikely that such advertisements would generate significant *intentional* clicks or installs by mobile users. For this reason, and on information and belief, the custom and practice in the

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

mobile advertising industry holds that significant reported app installs generated from purported advertisements on non-mobile optimized sites is indicative of fraud.

**E.  Uber Relied On Fetch To Identify And Remedy Fraud By Its Media Partners**

55.    Auto-redirects and unwanted popup advertisements are an unquestionable annoyance to every mobile smartphone user, including to Uber's potential and current customers. Separate and apart from the issue of unwittingly paying for such fraudulent advertisements, Uber has sought to protect its customer base from being subject to such harassment.

56.    Regardless of whether Fetch was acting in its capacity as Uber's agent or principal, Uber put its trust and confidence in Fetch to purchase mobile inventory consistent with Uber's goals of human viewable, *quality* mobile inventory at scale. Uber relied on its course of dealing with Fetch as acknowledgement of Fetch's responsibility to prevent fraud in the first place, and to identify and remedy any fraud that did occur.

57.    Fetch undertook this responsibility to prevent, identify and remedy fraud in Uber's mobile advertising campaigns.

58.    Among other things, Fetch recommended that Uber not purchase media from certain "blacklisted" networks and publishers due to concerns about efficiency and traffic quality for those entities. Fetch also represented to Uber on March 24, 2015 that it tracked publisher and site data in order to ███████████████████████████████████████████████████ ███████████████████████████████

59.    Fetch provided Uber with weekly fraud reports, which it represented ████████████ ████████████████████████████████

60.    Fetch regularly shared with Uber transparency reports that compiled performance data reported through TUNE. The transparency reports were intended to facilitate the review of publisher validity and performance and to authentic legitimate clicks and installations, so that Fetch could optimize Uber's mobile advertising. Because networks and publishers self-report data that appeared in the transparency reports, Uber relied on Fetch to police the quality and accuracy of that data as part of Fetch's end-to-end planning and management of Uber's mobile advertising.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

61.   Beginning in 2015, Fetch began to track new metrics, such as total clicks compared to clicks per unique visitor, which Fetch represented ████████████████████████████ ████████████████████.

62.   Fetch also analyzed referral URLs, validated site names, and made efforts to identify re-brokered traffic and malicious redirects. Fetch again represented ████████████████ ██████████████████████████████████.

63.   In certain instances, Fetch also acquired nominal "makegoods"—additional mobile inventory given in lieu of a refund—from individual networks or publishers for fraud identified by Fetch and/or Uber, and represented its diligence in doing so to Uber. Uber relied on Fetch's represented diligence in acquiring makegoods as evidence that Fetch was policing fraud among its media partners and on Uber's behalf.

**F.   Fetch Willfully Ignored Indicia Of Fraud In Order To Keep Collecting Payments From Uber**

64.   Fetch knew that the mobile inventory it purchased as Uber's agent, or as principal and resold to Uber, was intended to promote the Uber App and drive new installations and signups attributable to legitimate advertising.

65.   A reasonably skilled mobile advertising agency would have purchased quality mobile inventory and been aware of fraud by networks and publishers. A reasonably skilled mobile advertising agency would have taken active steps to curtail fake clicks, false reporting, and other fraudulent activities by the networks and publishers running advertisements for the agency's client.

66.   Instead, Fetch allowed networks and publishers to steal credit for organic installs of the Uber App, and Uber App installs that were attributable to other sources. While Fetch sat idly by, millions of Uber's dollars were squandered on nonexistent, nonviewable, and/or fraudulent advertising. ██████████████████████████████████████████████ ███████████████████████████████████.

67.   Fetch failed to disclose problems with the mobile inventory it purchased because it knew that Uber would have stopped purchases from the implicated networks and publishers, would

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1   have insisted on remediation for fraudulent advertising, and would not have paid ████████████

2   ████████████████

3        68.    Fetch actively mislead Uber to prevent it from discovering the true facts. ███

4   ████████████████████████████ and in doing so,

5   Fetch expressly or impliedly represented to Uber that those entities could provide the type of quality

6   mobile inventory Uber required to drive legitimate incremental installations of the Uber App by new

7   riders.

8        69.    Fetch provided Uber with transparency reports it represented as being an accurate

9   reflection of where Uber's mobile advertisements appeared, and the Uber App installations

10  attributable to those advertisements. Fetch also pointed to the weekly fraud reports and transparency

11  reports ████████████████████████████████

12  ████████████████████████████

13        70.    ████████████████████████

14  ████████████████████████████████

15  ████████████████████████

16        71.    As Fetch held itself out to be an expert in the mobile advertising industry, and

17  because Fetch was in a position of trust as Uber's advertising agent, Fetch's omissions and

18  misstatements induced Uber to continue its relationship with Fetch, and, foreseeably, to increase

19  spending on mobile advertising to millions of dollars per week ████████████████████

20  ████████

21        72.    In early 2017, Uber became aware of the pervasive fraud in the Fetch Campaign, in

22  part as a result of complaints from the public regarding Uber advertisements appearing on mobile

23  websites that Uber had previously requested Fetch block from participating in the Fetch Campaign.

24  Uber's investigation into that particular issue suggested deceptive naming was to blame.

25  Specifically, the publisher-reported name of the websites and mobile applications where Uber

26  advertisements supposedly appeared did not match the actual URL accessed. For example, one

27  publisher retained by Fetch reported clicks on Uber ads as coming from placements such as

28  "Magic_Puzzles" and "Snooker_Champion." In fact, those clicks actually originated from

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1  advertisements on Breitbart.com, despite the fact that Uber had instructed that no ads be placed with

2  that website.

3



9  **Figure 11 - Deceptive Naming of Breitbart.com in Fetch Transparency Reports**

10         73.      Just before Uber suspended the entire Fetch Campaign in March 2017, Fetch was

11  spending millions of Uber's dollars per week on mobile inventory purportedly attributable to

12  hundreds of thousands (even millions) of Uber App installs per week. Had the advertisements been

13  legitimate, one would expect to see a substantial drop when mobile advertising was suspended.

14  Instead, when Uber suspended the Fetch Campaign, there was no material drop in total installations.

15  Rather, the number of installations supposedly attributable to mobile advertising (i.e., "paid

16  signups") decreased significantly, while the number of organic installations rose by a nearly equal

17  amount. This indicated that a significant percentage of the installations believed to be attributable to

18  advertising were in fact stolen organic installations. In other words, these installations would have

19  occurred regardless of advertising. Instead networks or publishers in the Fetch Campaign

20  fraudulently reported the last click attribution to claim attribution credit and were paid for the

21  installation.

22

23

24

25

26

27  ///

28  ///

REED SMITH LLP
A limited liability partnership formed in the State of Delaware



**Figure 12 - Effect of Fetch Campaign Pause: Fetch Signups Replaced by Organic Signups**

74.    Fetch's own actions perpetuated, and even encouraged, fraud by the networks and publishers from whom it purchased mobile inventory.

75.    When Fetch obtained makegoods on behalf of Uber, the credit would be in the form of additional mobile inventory *with the same network or publisher*. In other words, after a publisher was caught red-handed, for example click spamming, Fetch would reward the bad actor with additional volume and opportunities to report fake clicks.

76.    Upon information and belief, Fetch also misused its position as a marketplace leader, and as Uber's mobile media agency, to solicit improper "rebate" payments from networks and publishers in exchange for purchasing advertising inventories during the Fetch Campaign, and failed to pass such discounts back to Uber.

77.    Fetch also failed to enforce Uber's prohibition against rebrokering. "Rebrokering" is where networks or publishers take advertising offers and re-broker them to third parties to obtain a greater volume of clicks, and thus, hopefully, installations. Rebrokering is against the terms of the

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1  IOs approved by Uber for use in the Fetch Campaign and also leads to a loss of control by the

2  mobile advertising agency over the quality of the advertising and the amount of fraud.

3       78.     Fetch also failed to disclose material conflicts of interest to Uber. Fetch purchased

4  media inventory during the Fetch Campaign from █████████████████████████████████

5  ████████████. Upon information and belief, Fetch, ███████████████████████ was

6  thus dis-incentivized to police fraud committed by ████████████████.

**G.     Current Status**

7

8       79.     Between 2015 and the first quarter of 2017, Uber paid out more than $82.5 million

9  for mobile advertising managed by Fetch. Uber is informed and believes that a material percentage

10  of that amount was used by Fetch to purchase nonexistent, nonviewable, and/or fraudulent mobile

11  inventory from networks and publishers who Fetch knew or should have known were perpetuating

12  fraud. Uber is further informed and believes that Fetch received a commission on such media spend,

13  despite knowing about the problems with the inventory it purchased as Uber's agent or on Uber's

14  behalf.

15       80.     Since learning of the extent of the fraud in the Fetch Campaign, Uber has withheld

16  approximately $7 million in payments to Fetch. Uber is informed and believes that a material

17  percentage of this amount was used by Fetch to purchase nonexistent, nonviewable and/or fraudulent

18  mobile inventory from networks and publishers who Fetch knew or should have known were

19  perpetuating fraud. Further, Uber is informed and believes that Fetch intended to seek a commission

20  on such fraudulent inventory despite knowing about the problems with the inventory it purchased as

21  Uber's agent or on Uber's behalf.

22       81.     Had Uber known of the extent of fraud in the Fetch Campaign earlier, it would have

23  taken steps to mitigate its harm, including but not limited to denying approval for Fetch to purchase

24  mobile inventory from networks and publishers perpetuating fraud; obtaining remediation for

25  fraudulent advertising and/or reporting; and/or terminating its relationship with Fetch and the

26  networks and publishers it engaged for the Fetch Campaign.

27

28

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

**CLAIMS FOR RELIEF**

**First Claim for Relief**

**Breach of Contract**

82.   Uber incorporates all of the above paragraphs as though fully set forth herein.

83.   Uber and Fetch were parties to a valid and binding Agreement. The Agreement, and SOWs executed pursuant thereto, provided, among other things, that:



In total, Uber paid Fetch more than $82.5 million related to the services ostensibly performed during the Fetch Campaign.

85.   Uber has fully performed all promises, covenants, and conditions required under the Agreement, except those that have been prevented or otherwise excused.

86.   Fetch materially breached the Agreement by failing to prevent and remediate fraud among the networks and publishers from which Fetch purchased mobile inventory on behalf of Uber, causing: (i) Uber to pay for mobile inventory that was not actually responsible for last click attribution; and (ii) Uber to pay Fetch commissions and/or bonuses on such fraudulent inventory.

87.   In addition, Fetch materially breached the Agreement by failing to disclose conflicts of interest and failing to pass back to Uber volume rebates, commissions, or discounts received from networks and publishers, causing Uber to overpay for mobile inventory and Fetch's commission.

88.   Fetch breached the Agreement knowing that its breaches would cause severe harm to Uber.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

89.     Fetch's breaches have caused, and will continue to cause, monetary damage to Uber in an amount that is no less than $50 million.

## Second Claim for Relief

### Breach of the Covenant of Good Faith and Fair Dealing

90.     Uber incorporates all of the above paragraphs as though fully set forth herein.

91.     Uber and Fetch were parties to a valid and binding Agreement.

92.     Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement. This implied covenant of good faith and fair dealing requires that no party do anything that will have the effect of impairing, destroying, or injuring the rights of the other party to receive the benefits of their agreement. The covenant implies that in all contracts, each party will do things reasonably contemplated by the terms of the contract to accomplish its purpose. The covenant protects the benefits of the contract that the parties reasonably contemplated when they entered into the agreement.

93.     Fetch breached the covenant of good faith, and unfairly and intentionally interfered with Uber's right to receive the benefits of the Agreement by, *inter alia*, failing to prevent and remediate fraud among the networks and publishers from which Fetch purchased mobile inventory on behalf of Uber, failing to disclose conflicts of interest, failing to stop rebrokering of mobile inventory, and failing to pass back to Uber volume rebates, commissions, or discounts received from networks and publishers.

94.     As a direct and proximate result of Fetch's breaches, Uber has suffered damages in an amount to be determined according to proof at trial.

## Third Claim for Relief

### Intentional Breach of Fiduciary Duty

95.     Uber incorporates all of the above paragraphs as though fully set forth herein.

96.     Fetch purchased mobile inventory in the United States, Mexico, France, the Philippines, Romania, and Singapore as Uber's agent. As such, Uber and Fetch were in a fiduciary relationship whereby Uber put its trust and confidence in Fetch to advise on mobile advertising, plan

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

and manage Uber's mobile advertising campaigns, and purchase mobile inventory valued at millions of dollars each week.

97.     Uber relied on the expertise of Fetch to act on Uber's behalf in devising and managing an effective mobile advertising strategy and campaign; vetting the networks and publishers Fetch acquired mobile inventory from; purchasing quality inventory; validating networks' and publishers' claimed Uber App installations; and optimizing the Fetch Campaign based on results—Uber App installs actually attributable to valid mobile advertising.

98.     Fetch breached its fiduciary duty by, *inter alia*, intentionally misrepresenting the effectiveness of its mobile media strategy and media purchasing decisions; misrepresenting the validity of transparency reports and networks/publishers' claims of app attribution; failing to identify and remedy fraud and rebrokering by networks and publishers recommended and utilized by Fetch in Uber's mobile advertising; failing to disclose and/or refund rebates Fetch received from networks and publishers; and/or failing to disclose its close relationship with the █████████████ ████████████████.

99.     Uber has suffered monetary injury and Fetch has been unjustly enriched by reason of the foregoing, in an amount to be determined according to proof, with pre- and post-judgment interest at the highest rate permitted by law.

100.    Fetch's representations and omissions were intentional, malicious, oppressive, or fraudulent, and give rise to liability for punitive damages according to proof at trial.

## Fourth Claim for Relief

### Constructive Fraud

101.    Uber incorporates all of the above paragraphs as though fully set forth herein.

102.    Fetch purchased mobile inventory in the United States, Mexico, France, the Philippines, Romania, and Singapore as Uber's agent. As such, Uber and Fetch were in a fiduciary relationship whereby Uber put its trust and confidence in Fetch to advise on mobile advertising, plan and manage Uber's mobile advertising campaigns, and purchase mobile inventory valued at millions of dollars each week.

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

103.    Uber relied on the expertise of Fetch to act on Uber's behalf in devising and managing an effective mobile advertising strategy and campaign; vetting the networks and publishers Fetch acquired mobile inventory from; purchasing quality inventory; validating networks' and publishers' claimed Uber App installations; and optimizing the Fetch Campaign based on results—Uber App installs actually attributable to valid mobile advertising.

104.    Fetch breached its fiduciary duty by, *inter alia*, intentionally misrepresenting the effectiveness of its mobile media strategy and media purchasing decisions; misrepresenting the validity of transparency reports and networks/publishers' claims of app attribution; failing to identify and remedy fraud and rebrokering by networks and publishers recommended and utilized by Fetch in Uber's mobile advertising; failing to disclose and/or refund rebates Fetch received from networks and publishers; and/or failing to disclose its close relationship with the ███████████████ ████████████████████.

105.    Uber has suffered monetary injury and Fetch has been unjustly enriched by reason of the foregoing, in an amount to be determined according to proof, with pre- and post-judgment interest at the highest rate permitted by law.

106.    Fetch's representations and omissions were intentional, malicious, oppressive, or fraudulent, and give rise to liability for punitive damages according to proof at trial.

### Fifth Claim for Relief

### Fraud

107.    Uber incorporates all of the above paragraphs as though fully set forth herein.

108.    Fetch knew that the mobile inventory it purchased as Uber's agent, or as principal and resold to Uber, was intended to promote the Uber App and drive new installations and signups attributable to legitimate advertising. As such, Fetch had an independent duty to disclose to Uber that the mobile inventory it purchased was not actually attributable to installations by new riders.

109.    Fetch knew that a substantial portion of the mobile inventory it purchased was nonexistent, nonviewable and/or fraudulent, and that such advertising was not attributable to legitimate riders installing the Uber App.

110.    Fetch failed to disclose problems with the mobile inventory it purchased because it knew that Uber would have stopped purchases from the implicated networks and publishers, would have insisted on remediation for fraudulent advertising, and would not have paid any commission or bonus to Fetch related to such advertising. By its omissions, Fetch intended to prevent Uber from discovering the true facts, and from taking actions that would have resulted in losses to Fetch.

111.    Fetch also made a number of materially false representations to Uber, including but not limited  to: (i) representing the networks and publishers it recommended could provide the type of quality mobile inventory Uber required to drive installations of the Uber App by legitimate new riders; (ii) representing the transparency reports to be an accurate reflection of where Uber's mobile advertisements appeared, and the Uber App installations driven by those advertisements; and (iii) affirmatively representing that its mobile advertising strategies and purchasing decisions were effective at increasing the number of legitimate riders installing the Uber App to request ridesharing services from drivers.

112.    Fetch's representations were false and Fetch knew as much at the time they were made. In the alternative, Fetch made such representations to Uber recklessly and without regard for the truth.

113.    Fetch intended that Uber rely on its omissions and misrepresentations to induce Uber to spend more on mobile advertising. As spending on mobile advertising increased, ████████ ████████████████████████████████████████████████████████████████████████████

114.    Uber reasonably relied on Fetch's omissions and misrepresentations and, as a result, approved millions of dollars each week, for over two years, on mobile inventory purchases that ran nonexistent, nonviewable and/or fraudulent advertising and as compensation for claimed installations not actually attributable to mobile advertising.

115.    Uber's reliance was justified because it was not made aware of the true facts. Had Uber known the true facts, Uber would have paid only for legitimate mobile advertisements attributable to installations.

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1    116.    Uber has suffered monetary injury and Fetch has been unjustly enriched by reason of

2    the foregoing, in an amount to be determined according to proof, with pre- and post-judgment

3    interest at the highest rate permitted by law.

4    117.    Fetch's representations and omissions were intentional, malicious, oppressive, or

5    fraudulent, and give rise to liability for punitive damages according to proof at trial.

6    **Sixth Claim for Relief**

7    **Negligent Misrepresentation**

8    118.    Uber incorporates all of the above paragraphs as though fully set forth herein.

9    119.    Fetch made a number of false statements set forth above, that were made without

10   reasonable grounds for believing them to be true when made, and such statements were false.

11   120.    Fetch intended that Uber rely on its false representations to induce Uber to spend

12   more on mobile media advertising. As media spending increased, ███████████████████

13   ████████████████████████████████████████████████

14   121.    Uber reasonably relied on Fetch's representations and, as a result, approved millions

15   of dollars each week, for over two years, on mobile inventory purchases that ran nonexistent,

16   nonviewable and/or fraudulent advertising and as compensation for claimed installations not actually

17   attributable to mobile advertising.

18   122.    Uber's reliance was justified because it was not made aware of the true facts. Had

19   Uber known the true facts, Uber would have paid only for legitimate mobile advertisements

20   attributable to installations.

21   123.    Uber has suffered monetary injury and Fetch has been unjustly enriched by reason of

22   the foregoing, in an amount to be determined according to proof, with pre- and post-judgment

23   interest at the highest rate permitted by law.

24   124.    Fetch's conduct constituted intentional misconduct or gross negligence that entitles

25   Uber to punitive damages according to proof at trial.

26   **Seventh Claim for Relief**

27   **Professional Negligence**

28   125.    Uber incorporates all of the above paragraphs as though fully set forth herein.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

126.    At all relevant times Fetch represented itself to be a leader in mobile advertising.

127.    Given the course of dealing between the parties, and custom and practice in the mobile advertising industry, Fetch knew that Uber intended to, and did in fact, rely on Fetch's expertise to devise and optimize its mobile advertising strategy and drive installations of the Uber App by legitimate new riders.

128.    In part of its role as Uber's mobile advertising agency, Fetch undertook the responsibility to prevent, identify and remedy fraud in Uber mobile advertising campaigns. Among other things, Fetch made recommendations to Uber about which networks and publishers to use (or not use based on Fetch's own "blacklist"); represented that it ███████████████████████████; held out the transparency reports as accurate representations of Uber App installs actually attributable to mobile advertising; and acquired makegoods on behalf of Uber from individual networks or publishers for identified fraud.

129.    Fetch had the duty, as a professional in the advertising industry, to use such skill, prudence, and diligence that other members of the profession commonly possess and exercise, including but not limited to a duty to prevent, identify, and remedy fraudulent advertising and reporting by the networks and publishers it engaged to participate in the Fetch Campaign.

130.    Fetch breached its professional duty by misrepresenting the effectiveness of its mobile media strategy and media purchasing decisions; misrepresenting the validity of transparency reports and networks/publishers' claims of app attribution; failing to identify and remedy fraud by networks and publishers recommended and utilized by Fetch in Uber's mobile advertising; failing to disclose and/or refund rebates Fetch received from networks and publishers; and/or failing to disclose its close relationship with the ████████████████████████

131.    As the actual and proximate result of Fetch's breach of its professional duty, Uber has suffered monetary damages in an amount to be determined according to proof, with pre- and post-judgment interest at the highest rate permitted by law

132.    Had Fetch used proper skill and care in monitoring networks and publishers, and remedying fraud, Uber would not have sustained harm.

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

**Eighth Claim for Relief**

**Negligence**

133.    Uber incorporates all of the above paragraphs as though fully set forth herein.

134.    At all relevant times Fetch represented itself as a leader in mobile advertising.

135.    Given the course of dealing between the parties, and custom and practice in the mobile advertising industry, Fetch knew that Uber intended to, and did in fact, rely on Fetch's expertise in mobile advertising including with respect to preventing, identifying and remedying fraudulent networks and publishers.

136.    Fetch had a duty to use such skill, prudence, and diligence as a reasonable mobile advertising agency, including but not limited to a duty to prevent, identify, and remedy fraudulent advertising and reporting by networks and publishers.

137.    Fetch breached its duty by misrepresenting the effectiveness of its mobile media strategy and media purchasing decisions; misrepresenting the validity of transparency reports and networks/publishers' claims of app attribution; failing to identify and remedy fraud by networks and publishers recommended and utilized by Fetch in Uber's mobile advertising; failing to disclose and/or refund rebates Fetch received from networks and publishers; and/or failing to disclose its close relationship with the ███████████████████████████████████

138.    As the actual and proximate result of Fetch's breach of its duty, Uber has suffered monetary damages in an amount to be determined according to proof, with pre- and post-judgment interest at the highest rate permitted by law

**Ninth Claim for Relief**

**Unfair Competition, Cal. Bus. & Prof. Code §§ 17200, *et seq.***

139.    Uber incorporates all of the above paragraphs as though fully set forth herein.

140.    Fetch engaged in unlawful, unfair, and fraudulent business acts and practices. Such acts and practices include, but are not limited to misrepresenting the effectiveness of its mobile media strategy and media purchasing decisions; misrepresenting the validity of transparency reports and networks/publishers' claims of app attribution; failing to identify and remedy fraud by networks and publishers recommended and utilized by Fetch in Uber's mobile advertising; failing to disclose

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

and/or refund rebates Fetch received from networks and publishers; and/or failing to disclose its close relationship with the █████████████████████████████████

141.    Fetch's business acts and practices were unlawful as described above.

142.    Fetch's business acts and practices were fraudulent in that a reasonable person would likely be deceived by Fetch's material misrepresentations and omissions concerning the quality and effectiveness of Fetch's mobile media strategy, purchasing decisions, and recommendations related to fraud; and the authenticity of networks and publishers' claimed app attribution.

143.    Fetch's business acts and practices were unfair in that the substantial harm suffered by Uber outweighs any justification that Fetch may have had for engaging in those acts and practices.

144.    Uber has been harmed as a result of Fetch's unlawful, unfair, and fraudulent business acts and practices. Uber is entitled to recover restitution, including without limitation all benefits that Fetch received as a result its unlawful, unfair, and fraudulent business acts and practices; and to injunctive relief restraining Fetch from engaging in further acts of unfair competition.

**Tenth Claim for Relief**

**Unjust Enrichment**

145.    Uber incorporates all of the above paragraphs as though fully set forth herein.

146.    Fetch knowingly and unjustly benefited from the conduct alleged herein, without providing commensurate consideration in return to Uber, and unjustly enriching itself and other third party bad actors.

147.    It would be inequitable to allow Fetch to retain the benefits of their fraudulent conduct.

148.    Uber is entitled to restitution of such amounts.

**PRAYER FOR RELIEF**

WHEREFORE, Uber respectfully requests the following relief:

149.    Judgment in Uber's favor and against Fetch on all claims for relief alleged herein;

150.    For damages in an amount to be proven further at trial;

151.    For preliminary and permanent injunctive relief;

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

152.    For punitive damages;

153.    For injunctive relief and restitution;

154.    For costs of suit incurred herein;

155.    For pre- and post-judgment interest;

156.    For attorneys' fees and costs; and

157.    For such other and further relief as the Court may deem to be just and proper.

## DEMAND FOR JURY TRIAL

Uber hereby demands trial by jury for all causes of action, claims, or issues in this action that are triable as a matter of right to a jury.

DATED:  September 18, 2017

REED SMITH LLP

By: /s/ John Bovich
    John Bovich
    Attorneys for Plaintiff
    UBER TECHNOLOGIES, INC.